FILED
2022 Mar-28  PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIC THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:19-cv-00892-JHE |
| | ) | |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, INC., et al., | ) | |
| | ) | |
| Defendants. | | |

### MEMORANDUM OPINION[1]

Plaintiff Eric Thomas ("Thomas") initiated this action against his former employer Defendant Alabama Great Southern ("AGS") (incorrectly identified as Norfolk Southern Corporation and/or Norfolk Southern Railway Company, Inc.) alleging claims for race discrimination and retaliation pursuant to 42 U.S.C. § 1981. (Doc. 1). AGS moves for summary judgment as to all claims. (Doc. 36). The motion is fully briefed and ripe for review. (Docs. 37, 42, & 46). For the reasons stated below, AGS's motion for summary judgment (doc. 36) is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 14.)

to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[2]

### A. Alabama Great Southern

AGS is a freight railroad that operates large freight trains transporting goods, including hazardous materials, running southwest from Chattanooga, Tennessee to New Orleans, Louisiana – through Birmingham, Alabama and Meridian, Mississippi. (Doc. 40-1 at 9 (32:2-13); doc. 40-28 at 10 (35:2-36:2)). AGS is an equal opportunity employer and has policies in place prohibiting discrimination based on protected categories, including race, and an anti-retaliation policy prohibiting retaliation against employees who report or complain about discrimination. (Doc. 40-1 at 11-12 (40:16-41:9)).

AGS also places a high value on the safety of its operations because there could be catastrophic consequences should an employee work in an unsafe manner. (Doc. 40-1 at 12-13 (43:4-13, 47:19-24)). As such, safety plays a significant role in the work of all employees, but particularly the work of Conductors and Locomotive Engineers ("Engineers"). (*Id.*).

### B. Thomas's Hire and Union Membership

---

[2] In his response to AGS's statement of undisputed facts, Thomas repeatedly states facts are 'denied/disputed in part' without elaborating on which portions he denies or disputes, or how the evidence he cites creates a material dispute of fact. The undersigned has noted these specific instances in footnotes throughout the opinion. However, to the extent the evidence Thomas cites contradicts AGS's evidence, the contradiction is noted. To the extent the evidence does not, all material facts Thomas cites are included.

AGS[3] hired Thomas as a Conductor Trainee on June 2, 2005, working out of Birmingham, Alabama. (Doc. 40-1 at 9, 11, 17 (32:14-17, 37:5-8, 62:9-63:3); doc. 40-10).   During his employment, Thomas was a member of the Brotherhood of Locomotive Engineers and Trainmen and was represented by the International Association of Sheet Metal, Air, Rail, and Transportation Workers, Local 622 ("Union"). (Doc. 40-1 at 11 (37:21-38:18), doc. 40-2; doc. 40-29 at 7 (22:10-18); doc. 40-29 at 19-25).   The collective bargaining agreement ("CBA") between the Company and the Union governed the terms of his employment.  (Doc. 40-1 at 11 (38:7-18)).

When he was hired and throughout his employment, Thomas committed to work safely and encourage his co-workers to do the same.  (Doc. 40-1 at 12-13 (43:14-45:8)).  Thomas further acknowledged that no job was so important or service so urgent that he could not take the time to perform his work safely, and that he would obey all safety rules.  (*Id.*).

A Conductor works closely with an Engineer (the more senior/skilled position) as a member of a two-person train crew.  (Doc. 40-1 at 13-14 (47:25-50:21))  Some of the Conductor's responsibilities include more physically demanding tasks, such as separating train cars and moving track switches to align track sections, as well as calling signals (i.e., stop, restricted speed).[4]  (*Id.*). Thomas testified that the Conductor is nicknamed the "boss of the train." (Doc. 40-1 at 13 (47:25-

---

[3] Thomas "dispute[s] in part" this statement, contending Thomas was employed by Norfolk Southern Railway Company, Inc. and Norfolk Southern Corporation, and asserting that these companies did not dispute Thomas's employment with them in their defense to a previous lawsuit Thomas filed. (Doc. 42 at 3, ¶ 4).  AGS states that it is a subsidiary of Norfolk Southern Railway Company, Inc. and Norfolk Southern Corporation.  (Doc. 46 at 2).  Where Thomas falls under the Norfolk Southern umbrella does not impact his discrimination and retaliation claims in this case.

[4] Although Thomas "dispute[s] in part" the facts in this paragraph, citing ¶ 2 of his affidavit, there is no discrepancy between AGS's characterization of his deposition testimony and the material Thomas points to in his affidavit.

49:2)).

As Thomas states in his affidavit, "[t]he conductor does work closely with the engineer, both have different functions in working together in making the train work properly. However, both have common knowledge of the work each crew member does. Some have more knowledge than others, but communication between the crew members helps each other understand how to perform certain tasks." (Doc. 43-4 at 2-3, ¶ 2). It is also undisputed that both crew members must comply with the rules. (Doc. 40-28 at 33 (126:3-13)). Additionally, although Thomas attempts to create a discrepancy in Austin's testimony regarding who is responsible for stopping the train (doc. 42 at 15, ¶55), Austin testified that the Engineer is primarily responsible for stopping a train and that it is the Conductor's responsibility to stop the train should the Engineer fail to do so. (Doc. 40-39 at 18-19 (67:21-68:12, 69:5-12)).[5]

## C. AGS Promotes Thomas to Locomotive Engineer

In mid-2010, AGS selected Thomas to receive training to become qualified as an Engineer. (Doc. 40-1 at 14-15 (52:6-53:15)). He qualified on February 28, 2011. (*Id.* at 15 (55:14-19)). Engineers operate with different skill sets, knowledge, and assume more responsibility than Conductors. (Doc. 40-28 at 8 (25:9- 20)). Engineers are responsible for operating (i.e. driving) the locomotive engines on the trains. (Doc. 40-1 at 15-17 (55:20-62:4); doc. 40-9). Consequently, Engineers are responsible for the speed of the train as well as the stopping of the train through use of various braking systems. (*Id.*) Thomas described the Engineer as the "driver" and the

---

[5] As discussed in more detail below, D.J. Austin was the Conductor who worked with Thomas as part of the two-man crew assigned to Train 314 traveling from Meridian, Mississippi to Birmingham, Alabama on April 3, 2015. (Doc. 40-34 at 46).

Conductor as a "navigator/coordinator." (*See* doc. 40-1 at 15-17 (55:20-62:4)).  However, because Engineers and Conductors are both members of the train crew, they are both equally responsible for safety issues on the train.  (Doc. 40-28 at 7-8 (24:20-28:8)).

Thomas recalls his supervisors' names being Wagner, Watson, Brandon (last name unknown), John Hill, Wilhite, and Greg Morgan.  (Doc. 40-1 at 10 (33:2-19)).

### D.  AGS and Union Adopt Disciplinary Process[6]

Discipline for AGS contract Engineers, such as Thomas, is governed by Article 31 of the CBA and the System Teamwork and Responsibility Training (" START") Policy.  (Doc. 40-29 at 6-7 (18:11-19, 22:4-18), 27).  Article 31 provides a formal process for discipline in which:  (1) an employee receives a formal charge letter describing the violation; (2) a selected Hearing Officer conducts an investigative hearing, which includes AGS and the Union (which represents the employee); (3) the Hearing Officer renders a decision; (4) the employee may appeal the hearing officer's decision through several layers up to a Public Law Board, comprised of an agreed neutral, a member of the Company and a member of the Union; and (5) the Public Law Board ("PLB") renders its final, binding decision.  (*Id.* at 3-4 (8:22-9:11), 20-24).  If the Company and employee agree on responsibility and discipline (other than dismissal), an employee may acknowledge responsibility and discipline for the offense in writing and waive the investigative hearing.  (*Id.* at 17 (62:13-64:17), 20-24).  Thomas states, before a crew member receives a formal charge letter, a supervisor is required to inform the charged employee of the violation.  (Doc. 43-4 at 3, ¶ 3).

---

[6] Although Thomas states he "dispute[s] in part" the facts in this section, the evidence offered does not actually create a factual dispute.  (*See* doc. 42 at 3, ¶¶ 9-10).  The evidence Thomas cites has been included.

The START Policy provides for the use of progressive discipline rather than formal hearings for minor offenses and, where appropriate "serious offenses." (Doc. 40-29 at 6 (19:10-20:23), 36-37). The START Policy is not used for major offenses that warrant being held from service pending a hearing and that could result in possible dismissal. (*Id.*). Thomas states that it is often left up to the supervisor's discretion to choose whether to charge a crew member with a START Minor or a START Serious. (Doc. 43-4 at 3, ¶ 4).

The CBA and START policies apply to conductors and engineers. (Doc. 43-4 at 3, ¶ 3).

### E. Thomas Commits Two Serious Violations, Leading to Disciplinary Action

On December 7, 2012, while serving as an Engineer, Thomas exceeded the limits of his track authority and occupied a main track line without authority, which is a violation of AGS's Operating Procedures and the Federal Railroad Act ("FRA"), 49 C.F.R. § 240.117(e)(4). (Doc. 40-1 at 18-21 (68:22-77:4); doc. 40-13). Thomas eventually accepted responsibility for the violation, which came with a 30-day suspension and a federally mandated 30-day revocation of his locomotive engineer certificate. (*Id.*). Thomas admitted that exceeding his track authority was a major incident due to the possibility of a train collision. (Doc. 40-1 at 21 (77:5-21)). Thomas's Conductor was similarly disciplined for this violation, per applicable federal regulations. (*Id.* (79:5-8)).

 Approximately two months after returning from suspension, on March 12, 2013, Thomas was involved in another significant safety incident, when his train passed a stop signal. (Doc. 40-1 at 21 (80:5-25)). Consequently, Thomas was charged with "(1) passing a STOP signal displayed . . . without proper authority and (2) speeding and excessive speeding . . . while operating on an Approach Signal indication. . . ." (Doc. 40-30 at 7 (21:5-22:6); doc. 40-30 at 20). The conductor

was also charged.  (Doc. 40-30 at 7 (21:5-23:6)).  The charges escalated to an investigation on June 11, 2013.  (Doc. 40-1 at 27 (102:22-103:15)).  At the hearing, Thomas admitted to passing the stop signal and speeding, but he claimed he was experiencing stomach problems due to ulcerative colitis at the time of the violations.  (*Id.* at 23 (85:23-86:10)).

On June 24, 2013, the Hearing Officer issued a determination finding Thomas responsible for the charged violations and dismissing him from service.  (Doc. 40-1 at 23 (88:11-17)).  The Hearing Officer similarly disciplined the Conductor involved.  (*Id.* (85:13-22)).  Thomas's discipline and the discipline of the Conductor were mandated by federal law.  (*Id.*).

Thomas grieved his dismissal through the Union and the matter went to PLB 7598.  (Doc. 40-1 at 24 (89:13-91:17); doc. 40-29 at 10-11 (36:10-38:4)).  AGS and the Union selected David N. Ray to serve as the neutral.  (Doc. 40-29 at 11 (38:5-9); doc. 40-14).  PLB 7598 found that Thomas was speeding and that he passed the stop signal going 36 miles per hour.  Nonetheless, the PLB reinstated Thomas, crediting his alleged medical issues.  (Doc. 40-14).  In reaching this decision, however, the PLB noted, "It is the Board's decision to give [Thomas] one more opportunity to show he can be an asset to [AGS].  [Thomas] will be reinstated with seniority unimpaired, but without pay for time lost . . . ."  (*Id.* at 1).

Thomas returned to work in June 2014.  (Doc. 40-1 at 26 (98:23-100:15); doc. 40-15).  Thomas contends that, although his Road Foreman informed him to work safely and prove himself to be an asset to the company, he was never told that he had *one more opportunity* to prove himself an asset.  (Doc. 43-4 at 3, ¶ 6).  Assuming Thomas is correct that no one told him he had one more opportunity, it is nevertheless true that the written PLB decision stated it was giving him "one more opportunity to show he can be an asset . . . ."  (Doc. 40-14 at 1).  Furthermore, Thomas

testified that he understood he had one more opportunity to prove himself an asset to AGS. (Doc. 40-1 at 25-26 (95:4-7; 98:21-22)). When asked if he thought he was on "thin ice," Thomas testified "I just know that I had one more opportunity." (*Id.* at 26 (98:18-22)).[7]

Thomas was "banner checked" eight times within two weeks after returning to work after his 2013 dismissal. (Doc. 40-1 at 13 (45:9-47:9); *see generally* 43-4 at ¶¶ 28-37). Banner checking is when supervisors block the railing and notify the train crew that there's an obstruction on the track. (*Id.*). However, Thomas's training records, which reflect other conductor certification rule evaluations (i.e., banner checks) did not reflect these additional banner checks. (Doc. 40-1 at 13 (45:16-47:9); doc. 40-5 & doc. 40-6). Thomas testified that banner checks are random and that he did not receive any discipline from the banner checks conducted in the weeks following his reinstatement. (Doc. 40-1 at 17 (62:16-63:7); doc. 40-10).

In the ten months after his reinstatement, Thomas was charged with three additional violations of the START Policy:

- Various brake use violations observed on random check of train tape data on November 4-5, 2014. (Doc. 40-1 at 28-29 (105:1-106:10, 108:1-13, 109:2-7); doc. 48-18; doc. 40-19). Thomas signed a Waiver of Investigation accepting responsibility for: (1) allowing the independent brake pressure to apply at a speed above 3 MPH while in full dynamic braking at MP 293.0; (2) failing to bail the independent brake allowing brake cylinder pressure to build when applying the automatic brake at MP 254.5; and (3) failing to make a full service reduction of the automatic brake while stopped at MP 230.1. (Doc. 48-18). Thomas

---

[7] A declaration or affidavit crafted to respond to a motion for summary judgment does not control over prior contradictory deposition testimony. *See e.g. Bryant v. U.S. Steel Corp.*, No. 10-13165, 428 F. App'x 895, 897 (11th Cir. 2011) (disregarding "sham" affidavit because it contained statements that "flatly contradicted [plaintiff's] earlier deposition testimony"). Thus, to the extent Thomas's affidavit contradicts his prior deposition testimony, it is due to be stricken. However, to the extent Thomas's affidavit narrowly states that no one verbally told him he had one more opportunity, that does not contradict his testimony that he understood he had one more opportunity or the PLB's written statement that Thomas had one more opportunity, which speaks for itself.

received a START minor for these infractions.  (*Id.*).

- Performing a backup movement with cars with more than the permissible number of powered axels on January 23, 2015.  (Doc. 40-1 at 29 (109:8-18, 112:9-20); doc. 40-20). Thomas received a START minor for this infraction.  (Doc. 40-10).

- Leaving equipment out to foul on March 28, 2015.  (Doc. 40-1 at 29 (109:19-110:5); doc. 40-10).  Thomas received a START Serious.  (Doc. 40-10).

Thomas acknowledges his signature on the Waiver for the November 2014 violations, but claims the handwritten date of February 5, 2015 is not his handwriting and that he signed this document sometime after April 3, 2015.  (Doc. 40-1 at 28 (105:11-106:10)).  Additionally, Thomas disagrees with all three disciplinary incidents and claims he did not commit any of these violations, but only signed the documents before his June 17, 2015 hearing because two unidentified supervisors told him he would be charged with insubordination if he did not do so. (*Id.* at 28-29 (105:1-23, 106:14-108:10, 109:8-110:21)).  However, the Union represented Thomas at this meeting and Thomas testified that his union representative advised him to sign the discipline. (*Id.* (110:19-20)).

## F. Another Serious Safety Violation and Termination of Employment

AGS's Operating Rules hold Engineers responsible for proper performance and handling of engines and require Engineers to use caution and good judgment in starting and stopping trains. (Doc. 40-38 at 27-28 (97:20-98:1)).

Safely stopping a train requires an Engineer to apply a series of brake systems, including dynamic brakes, automatic (air) brakes, and independent brakes.  (Doc. 40-38 at 10-11 (27:22-30:25)).  Dynamic brakes are the brakes that "drive the train" and is the braking system in which the motors can be reversed to offer resistance to slow the train.  (*Id.*).  Automatic or air brakes are

the brakes on the train cars that are pneumatically controlled from the lead engine.  (*Id.*).

Independent brakes are the physical brakes on the locomotive only. (*Id.*).  The emergency brake is

the braking system of last resort. (Doc. 40-38 at 27 (97:22-23)).  The Operating Rules provide:

> L-210. DYNAMIC BRAKE
>
> The dynamic brake is the first priority brake for controlling train speed.  It must be applied a sufficient distance in advance to ensure slowing to the desired speed safely . . . .  If necessary, automatic air brake may be used with dynamic brake applied.

(Doc. 40-37 at 39).  Thomas was aware of the required brake priority. (Doc. 40-1 at 37-38 (144:12-

145:8)).[8]

On April 3, 2015, Thomas and Conductor D.J. Austin (white) were the two-man crew

assigned to Train 314 traveling from Meridian, Mississippi to Birmingham, Alabama.  (Doc. 40-

34 at 46).  Train 314 was also designed as a "key" train because it was transporting hazardous

materials, including two tank cars filled with the poisonous inhalant, hydrogen chloride.  (Doc. 40-

1 at 34 (131:12-132:3); doc. 40-34 at 46).

---

[8] Although Thomas contends he "dispute[s] in part" these facts about the brake system (doc. 42 at 4, ¶ 20), the paragraph of his affidavit he cites provides as follows and does not show contradiction:

> The dynamic brake is the first priority brake for controlling train speed.  The air brake is used with or without dynamic brakes for better management of slack and improved train handling, when the dynamic brake is not available, or in an emergency.  The independent brake may only be used in switching, handling a light locomotive, starting a train on a descending grade of territory or in an emergency.

(Doc. 43-4 at 3-4, ¶7).  Thomas also points out that there is no written rule preventing a conductor from pulling an emergency brake on a train.  (Doc. 42 at 11, & 34 (citing doc. 48-30 at 14 (44:10-13))).

According to Thomas, the engineer who drove the train before he did on April 3, 2015, informed him that the dynamic brakes were weak, causing him to mainly use air brakes. (Doc. 40-1 at 32 (123:13-124:24)). Before leaving the Birmingham yard on April 3, 2015, Thomas informed the yardmaster that the dynamic brakes were weak, and the train would not be able to stop using only dynamic brakes. (*Id.* at 33 (125:14-22)). Thomas attempted to tell dispatch that it would be difficult to fit into the siding (explained below) at Smith and inquired into the possibility of the train staying at Briar. (*Id.* at 35-36 (134:17-136:8, 138:12-139:21, 141:12-23)). However, despite toning up dispatch four times and trying to call the dispatch office, Thomas received no answer from dispatch. (*Id.*).

On its route, Train 314 was to "meet" three trains, including a passenger train. (Doc. 40-1 at 37 (141:1-6)). For trains to "meet" where only one main line exists, one of the trains must enter and stop on a sidetrack or "siding" to wait for the other train to pass. (Doc. 40-38 at 7 (16:16-17:12)). That day, dispatch directed Train 314 to enter the siding between Toomsuba, Mississippi and the Smith Signal. (*Id.* at 6 (13:11-23)). There is a main line and siding at Toomsuba. (Doc. 43-4 at 4, ¶ 8).

At approximately 3:05 PM, in the siding near the Smith signal, Thomas directed Austin to place Train 314 into emergency through the use of the emergency brake. (Doc. 40-1 at 36 (137:11-18); doc. 40-39 at 11 (38:8-12, 40:6-8)). Austin did as Thomas instructed. (*Id.*). They called out "emergency, emergency" over the radio. (Doc. 43-4 at 4, ¶ 9). After they stopped,[9] Thomas then

---

[9] The train came to a complete stop fully in the siding, not blocking or hindering other trains from passing by. (Doc. 40-1 at 40 (153:9-19)).

contacted dispatch and notified AGS of the incident, while Austin went outside to inspect the train.[10]  (Doc. 40-1 at 40 (153:1-14); doc. 40-39 at 11-12 (40:9-42:18); doc. 43-4 at 4, ¶ 9).

Dispatch contacted Road Foreman of Engines Jacob Noe ("Noe") to advise him a key train with poisonous inhalants scheduled to "meet" a passenger train had been placed into emergency. (Doc. F at 12-13 (37:19-38:18)).  Noe immediately went to the location of the train to investigate. (*Id.*).

Upon arrival, Noe checked to ensure Thomas and Austin were unhurt and then asked them what happened.[11]  (Doc. 40-1 at 40 (153:20-25); doc. 40-38 at 13 (38:19-22); doc. 40-39 at 12 (44:1-19)).  Thomas told Noe the dynamic brakes were weak,[12] so he used the air brakes coming into the siding, but the brakes would not hold, so they had to "shoot the train" – i.e., place it into emergency.  (Doc. 40-1 at 40 (154:1-156:9)).   Thus, Thomas explained to Noe what happened from the time the train entered the siding and the time the train was placed in emergency.  (Doc. 53-4 at 4, ¶10).

According to Noe, after speaking with Thomas and Austin, Noe downloaded the data from the second engine and reviewed it in his truck.  (Doc. 40-1 at 40 (156:10-18); doc. 40-38 at 13 (38:21-40:2)).  On review, Noe noticed Thomas's verbal accounting of events was inconsistent

---

[10] In most occurrences like the one on April 3, 2015, the train crew is required to tell dispatch what they had to do to stop the train.  (Doc. 40-39 at 11-12 (40:6-41:17)).  After the train stopped, Austin confirmed that it did not derail, but did not inspect the train brakes.  (*Id.* at 12 (41:21-42:18)).

[11] Noe states that before this date, he knew Thomas in a good sense, in that he was an engineer that drove trains from Birmingham to Meridian.  (Doc. 40-38 at 36 (133:1-8)).

[12] Austin testified at his deposition that he does not recall if Thomas spoke to the yardmaster about the dynamic brakes not working properly.  (Doc. 40-39 at 8-9 (28:2-29:1)).

with the data on the train recorder.  (Doc. 40-38 at 13 (38:24-39:4)).  Noe then went back to the

lead engine to retrieve the train data for a comparison.  (*Id.* (39:7-16)).  While downloading the

data, Noe again asked Thomas and Austin to explain what happened.[13]  (Doc. 40-1 at 40 (156:16-

25); doc. 40-38 (13-14 (39:7-16, 41:20-42:22)).

At his deposition, Thomas testified that Noe asked for written statements from him and

Austin after he came back from downloading the data from the trains.  (Doc. 40-1 at 40 (156:16-

25)).  However, in his later filed affidavit, Thomas states "I explained to Noe what happened from

the time entering the siding and the time going into emergency.  Afterwards, Road Foreman Noe

asked us both to write down a statement of what happened."  (Doc. 43-4 at 4, ¶ 10).  In his brief,

citing the later-filed affidavit, Thomas contends that Noe asked them to give a written statement

"at this time[,]" referring to the initial conversation.  (Doc. 42 at 5, ¶ 25).  To the extent this portion

of Thomas's later-filed affidavit contradicts his previously filed deposition testimony, it is due to

be stricken.  *See Bryant*, 428 F. App'x 895, 897 (11th Cir. 2011).  However, when Noe asked for

---

[13] Thomas contends that Noe "tried to download the tapes off the engines, in which we found out he was unsuccessful while Austin and I were present.  If he had downloaded the tapes, off the second engine they would have been admitted as evidence at my investigatory hearing but were not admitted."  (Doc. 43-4 at 4, ¶ 11).  Additionally, Thomas states "Noe tried several times to try to download the tapes off of the engines but was unsuccessful.  He then looked at our written statements and asked us to sign and date them both."  (*Id.* at ¶12).  Thomas's speculation is insufficient to dispute Noe's testimony that he downloaded the train data at the scene.  Noe's testimony establishes that the time on the "data removed" time on the download is an internal clock that has nothing to do with a specific time zone or when the data was downloaded.  (Doc. 40-38 at 29 (102:9-103:24)).  Additionally, Noe also testified that the standard for presenting locomotive speed data is to present the lead locomotive because that is the locomotive the engineer sees as he is driving the train.  (*Id.* at 15 (47:20-48:8)).  Noe chose to compare the data from the two engines to validate the data and ensure accuracy.  (*Id.*).  The fact that the second engine's data was not presented at the hearing does not mean it was not downloaded.

a written statement does not appear to be material.

While Thomas and Austin prepared their written statements, Noe compared the train data from the lead engine to the previous data pulled from the second engine.  (Doc. 40-38 at 13-14 (39:17-22; 42:25-43:3)).   Noe determined the data from the lead engine and the second engine were consistent, confirming its accuracy.  (*Id.*).  Thomas's statement of events did not match this verified data.  (*Id.*).  Specifically, Thomas's verbal and written statement to Noe detailed a situation in which Thomas complied with standard braking procedures, which proved insufficient to stop the train and resulted in the train being placed in emergency to keep from passing a stop signal. (Doc. 40-37 at 45).   Thomas's written statement provided:

> At the 284.6, we got a [sic] approach restricted signal. Me and my conductor talked about how I was gonna have to use air coming into the siding because the dynamic brakes wouldn't hold.  As we approached the restricted signal at Toomsuba, I knocked the air off and lightened the dynamic brake.  I told the conductor the speed decreased to 12 mph as we entered the siding.  About 10-15 cars into the siding, I went to full dynamic and had to go to minimal service.  I briefed the conductor that we were gonna aim at stopping at the crossing but it was gonna be a tight fit.  Our train is 7021 and the siding is 7,253.  As we were coming into Smith, I had the train in full dynamic and full service. As we approached the road crossing on the Smith end of the siding, I put the air into handle off to stop the train.  It was still pushing at 4-5 mph [sic] the conductor asked did I have it under control to stop.  I told him to shoot the brakes because the air wasn't holding.

(*Id.*).

There are several discrepancies between the train data and Thomas's written statement.

- Thomas said he was using the automatic brake and "lightened" the dynamic brakes as the train approached the siding.  (Doc. 40-37 at 45).
- The data shows that Thomas was *not* utilizing the automatic brake at that point and that he had allowed the train's traction motor current (amperage) to fall to a point that the dynamic brakes *would not be effective* in slowing the train.  (Doc. 40-32 at 23-25; doc. 40-38 at 25 (86:18-87:2, 88:15-89:4)).
- Thomas said about 10-15 cars into the siding, he went into "full dynamic" and went to "minimal service" on the automatic brakes  (i.e., a 5-7 pound reduction). (Doc. 40-1 at 38,

44 (146:19-21, 172:9-11); doc. 40-33 at 28-29 (86:18-87:2, 88:15-89:4); doc. 40-38 at 26 (90:5-13, 90:24-25)).

- The data shows that while the train was in dynamic braking position, the dynamic brakes were rendered functionally ineffective by Thomas's operation of the train at such a low amperage.  (Doc. 40-32 at 24-26; doc. 40-38 at 25-26 (89:5-90:2)).  The data further shows that Thomas was not using the automatic brake at the point he indicated and that he did not actually enter minimal service until the train was 897 feet from its stopping point, which was only 49 feet from the stop signal.  (Doc. 40-32 at 24-26, 29, 40 (23:11-25:2, 28:5-11, 39:8-10); doc. 40-38 at 19, 23, 25-26 (63:2-65:8, 80:6-16, 89:5-90:2)).

- Thomas said that as the train was coming into Smith (halfway through the siding), he had the train in full dynamic and full service (a 21-25 pound reduction).  (Doc. 40-1 at 38, 44 (147:2-4, 171:14-172:7); doc. 40-33 at 29-30 (73:15-74:8); doc. 40-38 at 26 (90:14-23)).

- The data shows that half way through the siding (mile 281.49) Thomas did not have the automatic brake in full service, and was, in fact, not using the automatic brake at all.  (Doc. 40-32 at 26 (25:1-19), doc. 40-38 at 26 (91:2-16)). Further, while the train remained in dynamic brake position, Thomas had not raised the train's amperage to stabilize the dynamic brake system, so that the system remained effective.  (*Id.*).

- Thomas said he put the automatic brakes in to "handle off" (maximum application), but the train was still running 4-5 mph, so he had Conductor Austin engage the emergency brake.  (Doc. 40-1 at 38 (147:7-148:11); doc. 40-33 at 30-31 (74:11-76:6)).

- The train data shows a maximum application of the automatic brake at the same time as Conductor Austin pulled the emergency brake, roughly ten seconds before the train stopped.  (Doc. 40-32 at 39 (38:4-16)).

The data also reveals other train handling concerns and discrepancies.  (Doc. 40-38 at 26

(92:12-93:7).

- The first indication of an effort to slow the train with the dynamic brakes (by increasing amperage) did not occur until the train was more than a mile into the siding, which is only 7253 feet (1.37 miles) long.  (Doc. 40-32 at 27 (26:5-22), doc. 40-38 at 17-18 (57:22-58:10)).

- The first application of the automatic brakes did not occur until the train was 946 feet (.18 miles) from the stop signal.  (Doc. 40-32 at 29-30 (28:5-29:6), doc. 40-38 at 19, 23 (63:2-65:8, 80:6-16)).

- 259 feet from where the train stopped (308 feet from the stop signal) Thomas was no longer applying the automatic brake and had actively placed the throttle in Position No. 2, which began to *pull* the train and increased the speed from 2 mph to 3 mph.  (Doc. 40-32 at 34-36 (33:10-35:10), doc. 40-38 at 20-21 (69:2-71:13)).

- Thomas did not begin a renewed application of the automatic brake system until the train was 126 feet from its stopping point (175 feet from the stop signal).  (Doc. 40-32 at 36 (35:11-23); doc. 40-38 at 21 (72:3-17)).

Thomas "[d]ispute[s] in part" these discrepancies, citing his affidavit (doc. 42 at 5, ¶¶ 30-31), in which he asserts that "[t]he measurements given are false." (Doc. 43-4 at ¶ 13).   This is unsupported speculation.  During his deposition, Thomas was asked about the possibility of Noe manipulating the data based on the fact he used a computer, to which Thomas replied, "I'm saying it's possible."  (Doc. 40-1 at 51 (199:4-8)).   When asked if there was any other evidence of manipulation, Thomas replied, "No."  (*Id.* (199:9-12)).   Thomas also confirmed during his deposition that he did not raise the issue of possible data manipulation at his hearing.  (*Id.* (199:13-17)).

In his affidavit, Thomas contends that, if the data is correct, he "would have been speeding and would have gone through the end of the siding and went past the stop signal."  (Doc. 43-4 at 5, ¶ 13).   This is the first time Thomas raises this argument and it is in direct conflict with his deposition testimony that there is no additional evidence of data manipulation.  Furthermore, neither Thomas nor the Union expressed this theory at the investigatory hearing.  (Doc. 40-1 at 51 (199:13-17)).

The train data also provided data points that gave Noe confidence that the train's brake systems were operational.[14]  (Doc. 40-32 at 39-41 (38:17-40:18); doc. 40-38 at 31 (111:18-112:8)). For example, the train data showed maximum effort of the independent brake system at the time of stopping, which indicates the system was working as expected.  (Doc. 40-32 at 39-41 (38:17-

---

[14] In "[d]isput[ing] in part" these facts (doc. 42 at 5, ¶ 32), Thomas contends that he "never stated that the brakes didn't work, I stated that the dynamic brakes were weak."  (Doc. 43-4 at 5, ¶15).  This does not contradict the facts offered, which focus exclusively on Noe validating the data he saw to ensure there was not a mechanical malfunction.

40:18)).   Additionally, the train data showed the automatic brake system recovered after the emergency stop, which indicates the brake line was in place, recovered, and working as intended. (*Id.*).

Thomas points to Noe's deposition testimony that the train was placed into emergency within 111 feet from the stop signal (doc. 40-38 at 23 (80:3-5)), and that there is no specific company or federal rule stating it is improper to place a train in emergency to bring the train to a complete stop (*id.* at 27 (97:17-98:21)).   However, Noe actually testified that the rules require "the use of caution and good judgment starting and stopping trains.   Putting a train into emergency is the last resort.   It's not necessarily using caution or good judgment."   (*Id.*).

Additionally, Thomas testified at his deposition that weak dynamic brakes will not show a proper amperage of pressure applied to the brakes.   (Doc. 40-1 at 42 (162:18-163:8)).   However, Thomas further testified that he does not have any experience in reading train data.   (*Id.* at 41 (160:15-17)).   When asked if he agreed that for a dynamic brake to be even remotely useful, there has to be at least three hundred amps, Thomas replied that he could not attest to how much it would show.   (*Id.* at 42 (162:11-17)).

Based on the inconsistencies between the verified data and Thomas's story, Noe called Thomas to his truck and asked him again what happened.   (Doc. 40-1 at 41 (157:8-12); doc. 40-38 at 13 (39:23-40:5)).   According to Noe, he wanted to provide Thomas one last chance to correct his story before Noe reported his findings.   (Doc. 40-38 at 13 (40:3-9)).   Thomas, however, stuck to his story.   (*Id.* (40:9-10); doc. 40-1 at 41 (157:13-17)).   Noe asked Thomas if he was sure, and Thomas replied, "yes."   (Doc. 40-1 at 41 (157:13-17)).   Thomas testified that Noe did not tell him (or Austin) that he found any alleged inconsistencies between his statement and the train data at

18

this time.   (Doc. 40-1 at 41 (157:6-158:13)).  Noe testified he advised Thomas of these inconsistencies.  (Doc. 40-38 at 14 (43:1-13)).

Austin's written statement provided that "[c]ome in on a approach . . . Me and the engineer talked about him having to use air coming into Toomsuba because dynamic brakes wouldn't hold. As we approached the restricted signal at Toomsuba, the engineer said the speed had decreased, and . . . he told me he was in dynamic brake coming through the siding."  (Doc. 40-37 at 46). Austin's statement is not direct evidence of what Thomas did on the train, but reflects that Austin and Thomas talked about using air, as it is an account of what Thomas told Austin, not what Austin observed.  (*See id.*).

Noe reported his findings to his supervisor, who instructed Noe to remove Thomas and Austin from service,[15] pending further investigation, and to arrange for their transportation.  (Doc. 40-38 at 13 (40:11-15)).

Thomas inaccurately asserts that federal railroad regulations require both Engineers and Conductors to be punished equally.  (Doc. 42 at 8, ¶ 16).   Thomas and Austin were both subject to the rules of Federal Railroad Administration and the "cardinal rules."  (Doc. 40-28 at 16 (58:4-10)).   However, while there are federal regulations that mandate decertification for both the Conductor and the Engineer for certain violations (like passing a stop signal), these federal

---

[15] Although Thomas contends he was suspended from April 3, 2015 through June 2015, while Austin was not suspended (doc. 42 at 6, ¶ 3 (citing 43-4 at ¶ 26)), Thomas testified at his deposition that Noe told him and Austin they were being taken out of service.  (Doc. 40-1 at 10 (158:4-7)).  Hearing Officer Roberts does not know who decided to return Austin to service the week following April 3, 2015.  (Doc. 40-28 at 7 (22:11-23)).  Austin was placed back on the schedule 72 hours later.  (Doc. 40-39 at 16-17 (59:22-61:16)).  Austin believes his supervisor was Miguel Harris at the time.  (*Id.* at 15 (53:9-18)).

regulations were not implicated on April 3, 2015, because the train did not pass the stop signal. It is undisputed that Thomas's train handling on April 3, 2015, did not rise to the level of de-certification and did not violate a "cardinal rule" (doc. 40-38 at 33 (119:14-120:19); however, the charge indicated Thomas violated AGS's Operating Rules, which (as discussed *infra*) was affirmed by the PLB. (doc. 40-22 at 1).

### G. Thomas is Charged Based on the April 3, 2015 Events[16]

Based on the events of April 3, 2015, Thomas's verbal and written statements, and the train recording data, Noe prepared and sent a charge letter to Thomas notifying him of a hearing/investigation and the charges against him, which stated (in part) as follows:[17]

> The purpose of this formal hearing/investigation is to determine the facts and place your responsibility, if any, in connection with 1) Failure to properly control your Train 314A703, identified as a KEY Train, resulting in the train having to be placed in emergency to avoid passing a Stop Signal at approximately 3:05 p.m. on April

---

[16] Noe contemplated filing charges against Austin, but declined to do so.  (Doc. 40-38 at 34 (124:4-24)).  Austin testified that the only instruction regarding the incident he received was from the road foreman that called and told him he should have put the train in emergency earlier instead of letting it go a little further – specifically, about 100-150 feet earlier than the actual brake application.  (Doc. 40-39 at 17 (62:5-63:9)).

[17] Before he drafted the charges, Noe consulted his direct report Steve Wilburn and Labor Relations.  (Doc. 40-38 at 32 (114:2-115:1)).  Noe does not recall who he spoke with at Labor Relations.  (*Id.* (115:10-116:4)).

Andrew Shepard ("Shepard") has been the Director of Labor Relations since March 2012. (Doc. 40-29 at 4 (12:6-10)).  According to Shepard, the Director of Labor Relations is the highest designated officer for review of receiving claims and grievances, including discipline.  (*Id.* (12:14-18)).  Claims and grievances concerning pay, discipline, seniority, etc. are handled by Shepard; however, claims and grievances of discrimination are not.  (*Id.* at 5 (13:6-14:10)).  Generally, when charges of discipline are drafted by a charging officer, employees in Labor Relations will help formulate or draft the charge to ensure that the charges comply with the Collective Bargaining Agreement.  (*Id.* at 5-6 (16:6-18:10)).  Shepard had no personal involvement in drafting or formulating the charges against Thomas and does not personally know who was involved.  (*Id.* at 13 (45:23-47:23)).  Shepard was not involved with Thomas's case when it was appealed to the PLB.  (*Id.* at 13-14 (48:1-49:15)).

3, 2015 in the vicinity of Smith, Milepost 280.7 while you were serving as Engineer and 2) Conduct unbecoming for making false and conflicting statements concerning a matter under investigation at 05:30 pm on April 3, 2015.

(Doc. 40-34 at 41; doc. 40-38 at 32 (114:2-14)).

As the Charging Officer, Noe determined Thomas did not use good judgement in handling, or more specifically, in stopping Train 314, and that the technique Thomas did use was flawed, inadequate, and insufficient to stop the train without application of the emergency brake.[18]  (Doc. 40-32 at 42-43 (41:19-42:5; doc. 40-33 at 2-4 (46:6-9, 46:22-47:8, 48:18-21)).  Noe concluded that, at several points up to the stopping location, Thomas allowed the dynamic brakes to become ineffective.  (*Id.*).  At another point, Noe concluded, Thomas completely released the dynamic brake, abandoning it altogether, and began pulling the train.  (*Id.*).  Noe concluded that Thomas violated multiple Operating Rules by rapidly deploying all braking styles at the end, after he began pulling the train in close proximity to the stop signal.  (Doc. 40-33 at 5 (49:15-20); doc. 40-38 at 27-28 (97:20-101:2)).

Thomas asserts he "did not have the ability to make the dynamic brakes become ineffective[,]" that "[t]he dynamic brakes were already weak[,]" and that he "had to use the automatic brakes to help . . . slow[] down the train."  (Doc. 43-4 at ¶ 16).  Thomas further contends he "abided by all NS rules in handling of the train."  (*Id.*).  AGS contends Thomas's "disagreement" is insufficient to undermine Noe's well-reasoned determination based on the

---

[18] Thomas contends he was not charged with improper dynamic brake use for April 3, 2015 (doc. 42 at 12, ¶ 37), but, as Noe explained, "So yeah, he was charged with improper train handling, dynamic brake is part of train handling, so he was charged with that rule."  (Doc. 40-38 at 28 (99:1-101:2)).

objective data.

Noe additionally determined Thomas was not honest with him in his verbal and written statement.  (Doc. 40-33 at 12 (56:7-11); doc. 40-34 at 25 (114:9-12)).  AGS demands honest, intelligent, and courteous discharge of duty.  (Doc. 40-37 at 44).  Based on the train data, Noe believed Thomas's description of his attempt to stop the train was not only inaccurate, but deceptive, and charged him accordingly.[19]  (Doc. 40-33 at 14 (58:12-14, 114:9-12)).

Again, Thomas asserts that Noe could not download the train data at the scene and was not able to get a reading of the tapes until after 11:00 PM, when Thomas was already in Birmingham.  (Doc. 43-4 at ¶17).  As explained *supra*, Thomas's speculation is insufficient to dispute Noe's testimony regarding the train data.

## H.  AGS Conducts an Investigatory Hearing, per the CBA and Applicable Disciplinary Policies

Thomas's charges proceeded to formal hearing on June 17, 2015.  (Doc. 40-32 at 2).  Carter Roberts, Road Foreman of Engines, served as Hearing Officer and two Local Union Chairmen represented Thomas.[20]  (*Id.*).  Noe, Austin, and Thomas testified as witnesses.  (*Id.*).

Noe testified first, describing his communications with Thomas and Austin and detailing the meaning and significance of the train data he reviewed, including how the data conflicted with

---

[19] Although Thomas asserts that "Noe desired to punish [him] harshly because he could have potentially caused an accident while operating a Key train" (doc. 42 at 13, ¶ 46), in his email Noe actually states that "[t]he intent is ***not*** to pile on charges . . . but [t]his incident had a huge potential to be devastating to our company and would like to handle this accordingly.  As info Thomas already has a previous stop signal violation."  (Doc. 43-3 at 2) (emphasis added).

[20] To Robert's knowledge, at the time of the investigative hearing, he and Noe were the only road foreman that held hearings.  (Doc. 40-28 at 11 (36:16-23)).

Thomas's statement.  (Doc. 40-32 at 13-41 (12:13-40:19)).  Noe further testified as to the numerous rules Thomas violated that day while transporting dangerous, poisonous inhalants.  (Doc. 40-32 at 42 (41:13-); doc. 40-33 at 16 (-60:5)).  Austin then testified about his communications with Thomas that day, as well as his application of the emergency brake.  (Doc. 40-33 at 21-28 (65:18-72:15)).  Thomas testified third, primarily answering questions posed by Hearing Officer Roberts.  (Doc. 40-33 at 28 (72:18-); doc. 40-34 at 4 (-96:15)).  In summary,[21] Thomas:

- Stood by his written statement.  (Doc. 40-33 at 21 (65:10-13)).

- Admitted his statement did not match the train data in any material respect.  (Doc. 40-33 at 38-32, 35, 37 (72:18-74:8, 74:11-76:6, 79:16-18, 81:2-9)).

- Admitted he did not regularly approach a stop signal in the manner he did on April 3, 2015.  (Doc. 40-33 at 35 (79:2-4)).

Neal Elders represented Thomas at the hearing.  (Doc. 40-28 at 30 (113:7-22)).  Elders confirmed that Thomas was provided an opportunity to change his story and admit that he did something wrong, perhaps to receive a lighter discipline, but Thomas refused to do so.  (*Id.* (115:14-116:12).

Although radio conversations between the train crew and dispatchers are recorded (doc. 40-28 at 31 (119:20-120:10)), Roberts did not listen to any such dispatcher tapes during the June

---

[21] Although Thomas contends he "dispute[s] in part" these facts about the investigatory hearing (doc. 42 at 5, ¶¶ 39-41), the paragraphs of his affidavit he cites do not contradict the cited hearing testimony.  (*See* doc. 43-4 at ¶¶ 19-21).  Instead, Thomas (again) points to the discipline he claims he was forced to sign before the hearing, claims the data could not be right because he would not have been able to stop, and insinuates Noe improperly withheld Austin's written statement from evidence until the Union requested he introduce it.  (*See id.*).

17, 2015 hearing because Noe, as Charging Officer, did not provide them as part of the evidence. (*Id.* at 32 (122:5-18)).  At his deposition, Roberts testified that the recorded conversations with dispatch "really had no bearing on the charge of the train being put in emergency coming up against a stop signal" and characterized them as "peripheral information."  (Doc. 40-28 at 32 (123:16-23)). Noe explained that, in response to such a request (for a recording from dispatch) someone in the chief's office would have reviewed the recordings, and they determined whatever Thomas's representative was looking for was not there.  (Doc. 40-38 at 12 (35:8-37:8)).  AGS maintains that what Thomas and/or Austin told dispatch is immaterial because the relevant inquiry was what Thomas told Noe about the incident, not what Thomas and/or Austin told dispatch.  (Doc. 46 at 11).

### I.   AGS Terminates Thomas's Employment

After the conclusion of the hearing, Roberts considered the evidence he had seen, the testimony he had heard, and Thomas's service record[22] in order to render a decision and a recommended course of action.  (Doc. 40-28 at 15 (53:13-56:5)).  Roberts ultimately determined Thomas failed to properly control key Train 314 and was dishonest in the investigation.  (Doc. 40-21 at 1).  Given Thomas's previous dismissal for a stop signal violation and the dangerous handling of Train 314, Roberts determined that Thomas was not a safe engineer and that Thomas did not need to operate a train.  (Doc. 40-28 at 15 (54:18-23)).

_____

[22] To the extent Thomas implies that Roberts should have spoken with Labor Relations (doc. 42 at 8-9, ¶ 19), Roberts testified that it is typical practice for the hearing officer *not* to consult with Labor Relations, but instead it would be the responsibility of the Assistant Division Superintendent, if needed.  (Doc. 40-28 at 15-16 (56:19-57:16)).

Specifically, as Hearing Officer, Roberts had the authority to recommend dismissal which would be reviewed by the Assistant Division Superintendent. (Doc. 40-28 at 6 (18:1-16)). Roberts sent his dismissal recommendation to the division staff and received approval.[23] (Doc. 40-30 at 12 (42:8-16)). Roberts described the typical procedure but could not say who in the division approved his recommendation to dismiss Thomas. (Doc. 40-28 at 7 (23:1-24:11)).

Consequently, on July 1, 2015, Roberts sent Thomas a dismissal letter stating, "The evidence adduced in the above formal hearing/investigation clearly proved that you were guilty of the charges above and you are hereby dismissed from all service. . . ." (Doc. 40-21 at 1; doc. 40-1 at 48 (185:9-186:9)).

### J.   Thomas's Appeal

Thomas grieved his dismissal to the Public Law Board ("PLB"). (Doc. 40-1 at 48 (186:10-18)). The Company and the Union agreed to have David N. Ray serve as the neutral. (*Id.* at 49-50 (192:6-193:11); doc. 40-22 at 1). On or about October 13, 2016, the PLB rendered its ultimate decision, concluding as follows:

> Substantial evidence supports the charges against Claimant. The carrier avers Claimant used poor judgment in his application of the various braking systems, which ultimately necessitated the emergency brake application. The engine tapes demonstrated that Claimant operated for 1.3 miles using ineffective dynamic brakes without applying the automatic brake as required under the circumstances. Claimant was not truthful about his train handling, even when faced with the engine tapes. Based on the facts of this case and Claimant's discipline record, the Board will not disturb the Carrier's action.

(Doc. 40-22 at 1). After all procedural matters following a PLB hearing have concluded, the

---

[23] Noe was not involved in the decision to terminate (or recommendation to terminate) Thomas. (Doc. 40-38 at 37 (134:1-7)).

ultimate decision of whether to reinstate an employee (or to not reinstate an employee) rests solely with the arbitrator or neutral of the case.  (Doc. 40-29 at 5-6 (16:15-19:3)).

### K. Thomas's Allegations of Race Discrimination

Ricky Morris ("Morris") is the Manager of EEO and has held that position since March 2012.  (Doc. 40-40 at 5 (13:17-22).  Morris's role is to manage a team of officers that investigate internal complaints and respond to all formal charges of discrimination along with assisting the law department with EEO lawsuits.  (*Id.* (13:23-14:10)).  Morris reviews EEOC charges once they are received by the company and assigns them to one of three subordinates to investigate.  (*Id.* at 5-6 (16:19-17:9)).  Morris was not involved in Thomas's termination.  (*Id.* at 16-17 (60:23-61:12)).

Thomas claims he was dismissed from service because of his race, African-American. (Doc. 40-1 at 52 (204:10-15)).  Thomas does not recall ever hearing anyone in management make a derogatory comment about his race.  (*Id.* at 57 (221:25-222:6)).  Rather, Thomas testified that the ***only*** reason he believes his race played a role in his dismissal is because Austin, who is white, was not also charged.[24]  (*Id.* at 52-53 (204:10-206:17)).

Noe testified he contemplated charging Austin and looked at the same rules he considered for Thomas.  (Doc. 40-38 at 34 (123:20-23, 124:4-24)).  However, the implicated rules focused on train handling, which is in the province of the Engineer, not the Conductor.  (*Id.*).  Austin was not a locomotive engineer and did not have engineer training.  (*Id.*).  Austin and Thomas were performing different job tasks and had different responsibilities on the train.  (Doc. 40-28 at 8

---

[24] Thomas's affidavit confirms that this is his belief, not that he disputes it.  (*See* doc. 43-4 at ¶ 23).

(25:9-26:1)).  As such, they are not necessarily held responsible for the same actions or inactions

on the train, unless mandated by federal law.  (*Id.* (25:9-27:18)).  Consequently, Noe did not charge

Austin because he could not find that Austin violated a rule.[25]  (Doc. 40-38 at 34 (124:4-24)).

Likewise, Noe did not charge Austin with false and conflicting statements because Austin's

statement reflected what Thomas told him.  (Doc. 40-34 at 26 (118:1-5); doc. 40-38 at 31 (112:25-

113:7)).  The portions of Thomas's statement that were false and conflicting were those regarding

train handling, of which Austin had no independent knowledge.  (Doc. 40-34 at 26 (118:1-5); doc.

40-38 at 13, 31 (39:20-22, 112:25-113:7)).  Thomas's assertion that "Austin was able to see

everything I was doing on the train that day[]" and that he "explained to him the reasons behind

my actions on the train and why I was taking those actions to drive the train[]" are insufficient to

create a dispute.  (*See* doc. 42 at 6, ¶ 47 (citing doc. 43-4 at ¶ 24)).  Even if Thomas explained what

he was doing to Austin, that would not change Austin's job on the train.

### L.  Thomas's Allegations of Retaliation for Filing a Charge of Discrimination

On September 12, 2012, Thomas filed an EEOC Charge claiming race discrimination in

the selection of conductors for the Remote Intelligent Terminal system training team ("RIT").

(Doc. 40-1 at 51-52 (200:20-201:18); doc. 40-23 at 1).  The EEOC issued Thomas a Notice of

Rights in June 2015, and Thomas and others filed a lawsuit in September 2015.  (Doc. 40-1 at 52

---

[25] Although Thomas purports to dispute Noe's thought process related to his decision to
not charge Austin for the April 3, 2015 incident (doc. 42 at 5-6), Thomas's assertions are
immaterial.  While it is true that the entire crew is responsible for safety issues and that a conductor
has a duty to prevent an engineer from passing through a stop signal (*see id.*), Thomas's train did
not pass through a stop signal and Austin discharged his duty by ensuring that the train did not do
so.

(202:1-22); doc. 40-40 at 9 (29:13-18), at 18).  Thomas testified that AGS alerted "various people" about this discrimination "lawsuit" and that there was a document "floating around" about the lawsuit.  (Doc. 40-1 at 48 (187:20-188:25)).

On August 4, 2015, Thomas filed a second EEOC charge based on his termination.  (Doc. 43-4 at 8, ¶26).  The failure to promote lawsuit was resolved in June 2016, and was dismissed by joint stipulation of dismissal in September 2016.  (Doc. 40-1 at 8 (203:2-7)).  On September 23, 2016, the PLB denied Thomas's request for reinstatement.  (Doc. 43-4 at 8, ¶ 26).

Thomas claims he was subjected to four instances of retaliation for this 2012 charge: (1) the START-Minor issued February 5, 2015, for poor braking; (2) the START-Minor issued on May 18, 2015, for a backup move violation; (3) the START-Serious issued on June 2, 2015, for leaving equipment in foul; and (4) his dismissal on July 1, 2015.  (Doc. 40-1 at 53-55 (207:14-25, 210:25-213:13)).  Thomas clarified that he does not claim the PLB decision upholding his dismissal was retaliatory.  (*Id.* at 54-56 (212:20-213:2, 218:23-219:5)).  Thomas does not dispute that he is claiming retaliation based on these events, but reiterates his position that he was "forced" to sign the discipline as discussed *supra*.  (*See* doc. 42 at 6, ¶ 49 (citing doc. 43-4 at ¶25)).

Thomas claims the discipline was retaliatory because he was not made aware of the violations before the April 3, 2015 incident or the investigative hearing.  (Doc. 40-1 at 55 (213:14-214:9)).  However, Thomas admitted: (1) no one said anything to him about his previous charge; (2) he has no personal knowledge that any of the individuals involved in his discipline were aware of his charge of discrimination; and (3) it is only speculation that the discipline was retaliatory.  (*Id.* at 32, 55 (121:21-123:12, 214:10-215:5)).

For his dismissal, Thomas said it was "possible" that Noe manipulated the train data

because he used a computer to download the data, but admitted manipulation was not a theory raised at the investigative hearing.[26]  (Doc. 40-1 at 51 (199:4-17)).  Regardless, Thomas admitted he has no evidence that Noe, as the Charging Officer, and Roberts, as the Hearing Officer, were aware of his prior charge of discrimination.  (Doc. 40-1 at 48 (187:20-188:11)).  Noe and Roberts testified they were not, in fact, aware of Thomas's 2012 charge of discrimination. (Doc. 40-28 at 16 (58:4-10, 59:6-10); doc. 40-38 at 36 (133:13-19)).

### III. Analysis

Thomas asserts a race discrimination claim and a retaliation claim pursuant to 42 U.S.C. § 1981 against his former employer based on his termination.[27]  (Doc. 1).  When such claims are based on circumstantial evidence, as they are here, courts routinely apply the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate whether the plaintiff has presented sufficient evidence to proceed to trial.  Despite Thomas's

---

[26] To the extent Thomas offers ¶ 27 of his affidavit to dispute these facts (doc. 42 at 6, ¶ 51), that paragraph is due to be stricken as unfounded and contradicted by his prior sworn disposition testimony.  Without citation, again Thomas contends Noe did not timely download the train data and infers there is possible manipulation of data.  (Doc. 43-4 at ¶27).  There is simply no support for these assertions.  Furthermore, to the extent Thomas asserts that "[a]ll supervisors were aware of the lawsuit of discrimination[,]" Thomas testified that he had no personal knowledge that any of the individuals involved in his alleged retaliatory discipline or termination were aware of the EEOC Charge.  (Doc. 40-1 at 32, 48, 54-55 (121:21-123:12, 187:20-188:11, 214:10-215:5)).  To the extent that Thomas actually meant "lawsuit" (as opposed to charge), the lawsuit was not filed until months after the alleged retaliatory discipline and his dismissal and thus they could not have known about something that had not happened.

[27] Because § 1981 discrimination and retaliation claims are governed by a four-year limitations period, *see* 28 U.S.C. § 1658(a), only claims based on actions taken after June 10, 2015, are timely.  *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008).  Furthermore, Thomas's response brief in opposition to summary judgment makes clear his race discrimination and retaliation claims are based on his termination.  (*See* doc. 42).

assertion to the contrary (doc. 42 at 19-22, 25), the Supreme Court's more recent decision in *Comcast Corp. v. National Ass'n of African American-Owned Media*, -- U.S. -- , 140 S. Ct. 1009 (2020), does not change this.   Instead, *Comcast Corp.* makes clear that, to succeed on a § 1981 claim, the plaintiff "bears the burden of showing that race was a but-for cause of [his] injury" as opposed to showing that race was a motivating factor in the decision. 140 S. Ct. at 1014.  Notably, even after *Comcast Corp.*, courts continue to routinely analyze race discrimination claims based on circumstantial evidence using the *McDonnell-Douglas* framework, simply applying the "but-for" standard when appropriate.[28]  *See e.g., Mitchell v. Sch. Bd. of Palm Beach Cnty., Fla*., No. 19-CV-81534-RUIZ/REINHART, 2021 WL 1381325 (S.D. Fla. Mar. 25, 2021); *Freeland v. HR Synergies, LLC*, -- F. Supp. 3d --, 2020 WL 7364507 (M.D. Ga. 2020).

## A. Race Discrimination

To survive a motion for summary judgment, a plaintiff alleging intentional discrimination must present sufficient evidence from which a jury could find in his favor.  A plaintiff may use direct or circumstantial evidence to do so.   Often times, there is no direct evidence of discrimination.    When there is only circumstantial evidence, plaintiffs generally use the *McDonnell-Douglas* framework.  Under this framework, to establish a *prima facie* case of race discrimination, Thomas must show that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) he was

---

[28] Courts have been applying a similar "but for" causation standard in other contexts.  For example, courts have applied a but-for causation standard in age discrimination cases since the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar*, interpreting § 2000e-3(a)'s use of the word "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action.  570 U.S. 338, 352 (2013).

treated less favorably than a similarly-situated individual outside his protected class. *Bigger v. Koch Foods of Ala., LLC*, 461 F. Supp. 3d 1176, 1183 (M.D. Ala. 2020) (citing *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019); *Maynard v. Bd. of Regents*, 342 F. 3d 1281, 1289 (11th Cir. 2003)).

Generally, the critical showing is whether the plaintiff was treated less favorably than a similarly-situated individual outside of his protected class. The similarly-situated person is called a "comparator." Thomas asserts that "the but-for causation standard does not require the identification of possible comparators outside of [Thomas's] protected class" and then contends that AGS's treatment of Austin answers the "but-for" question of "What would have happened if Thomas was white?" (Doc. 42 at 22).

Thomas is not completely off track – to the extent that the ultimate question is whether there is sufficient evidence for a jury to conclude that Thomas would not have been fired if he was white. *See Comcast Corp.*, 140 S. Ct. at 1014. Additionally, Thomas is correct that he is not tethered to the *McDonnell-Douglas* framework to make his case. Thomas's discrimination claim may proceed if, after demonstrating membership in a protected class, qualification for the position, and an adverse employment action, Thomas presents "a convincing mosaic of circumstantial evidence" that would allow a jury to infer intentional discrimination by the employer. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). However, there are reasons why courts require comparators to be similarly situated in "all relevant respects" and require the quality of the comparator's misconduct be "nearly identical." *See Foster v. Biolife Plasma Servs.*, 566 F. App'x 808, 811 (11th Cir. 2014). Evidence that another employee was treated differently is not probative of a discriminatory intent when these comparator requirements are not met.

To this end, "a valid comparator will turn not on formal labels, bur rather on substantive likeness." *Lewis v. City of Union City*, 918 F.3d 1213, 1228 (11th Cir. 2019) (*en banc*). While the precise "similarity" is "to be worked out on a case-by-case basis," a similarly-situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" "will have been subject to the same employment policy;" "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor;" and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

Austin is not a valid comparator because he is not similarly situated to Thomas in the requisite "all relevant respects." In other words, the fact that Austin was not terminated based on the April 3, 2015 incident does not help Thomas show that race was the but-for cause of his termination. Each of Thomas's arguments fall apart when Thomas and Austin are compared. Specifically, Thomas's argument that both he and Austin were responsible for safety and that there was no "cardinal rule" violation does not change the result. (*See* doc. 42 at 22-25). As engineer, Thomas was solely responsible for safely operating the train and chiefly responsible for safely stopping the train. (Doc. 40-1 at 15-17 (55:20-62:4); doc. 40-9). In contrast, with regard to stopping the train, as conductor, Austin was responsible for engaging the emergency brake to avoid passing a signal. (Doc. 40-28 at 8 (27:1-4); doc. 40-39 at 15-16, 19 (56:17-57:6, 69:8-12)). On April 3, 2015, Austin discharged this duty because the train did not pass the stop signal.

Thomas continues to assert that both crew members are "equally" responsible for safety issues on the train. (Doc. 42 at 24). And, of course, they are – to some extent. Each crew member being responsible for safety and to execute his job duties safely does not mean that each crew member has the same duties and responsibilities, even as it relates to things that impact safety.

Despite Thomas's attempt to conflate their duties, AGS's investigation revealed that the events that led to Train 314 being placed into emergency on April 3, 2015, were the result of Thomas's inadequate train handling as the engineer, not anything Austin did or did not do as conductor.   (Doc. 40-32 at 42-43 (41:19-42:5; doc. 40-33 at 2-4 (46:6-9, 46:22-47:8, 48:18-21); doc. 40-38 (123:20-23, 124:4-24)).   Of course, as Thomas points out (doc. 42 at 24), both crew members are responsible for safety issues on the train.   But, again, a shared responsibility for safety does not change the fact that an engineer and a conductor have different responsibilities on the train. (*See* doc. 40-39 at 18-19 (67:21-68:12, 69:5-12) (Austin testified that the engineer is primarily responsible for stopping a train and that it is the conductor's responsibility to stop the train should the engineer fail to do so.)).   To this end, federal courts have expressly recognized that engineers and conductors are not generally comparable because they have different job duties and an engineer is a step above a conductor in the railroad hierarchy.   *See Player v. Kansas City So. Ry. Co.*, No 06-1980, 2011 WL 5572920, *5 (W.D. La. Nov. 16, 2011) (explaining that even though there are similarities, the plaintiff still must show that he and the alleged comparators had substantially similar job responsibilities and that engineers and conductors are generally not comparable); *Burley v. Nat'l Passenger Rail Corp.*, 33 F. Supp. 3d 61, 74 (D.D.C.), *aff'd*, 801 F.3d 290 (D.C. Cir. 2015) (finding a conductor and engineer involved in the same accident were not comparators because they had distinct responsibilities on the train).   Thus, while there could be a situation where an engineer and conductor both violated a safety rule, the undisputed evidence does not show that here.   There is simply no evidence to suggest the differential treatment of Thomas and Austin was based on their different races as opposed to their different responsibilities on the train.

Additionally, Austin is not a proper comparator (and AGS's treatment of Austin is not probative of discrimination) because Austin did not provide a false or conflicting statement. Austin's verbal and written statements about the incident reflect his communication with Thomas **and** his action placing the train in emergency (which was supported by the train data).  (Doc. 40-34 at 26 (118:1-5); doc. 40-38 at 13, 31 (39:20-22, 112:25-113:7)).  By contrast, Thomas's statement reflected his discussions with Austin and the actions he took.  The actions Thomas reported conflicted with the objective train data and led to the charge against him.  (*Id.*).

Finally, Austin would not be a proper comparator because Thomas's previous dismissal and other discipline puts Thomas in a different position than Austin, as there is no evidence Austin had a similar disciplinary history. *See Lewis*, 918 F.3d at 1228.  For these reasons, Thomas's argument that a reasonable jury could infer he was fired because of his race because AGS did not charge and terminate Austin for the August 3, 2015 incident is without support.[29]  Alternatively,

---

[29] Even assuming Thomas could state a *prima facie* case for discrimination, his claim would fail because he offers no evidence of pretext to rebut AGS's legitimate, business reason for terminating his employment.  Once a plaintiff establishes a *prima face* case, the burden of production (not proof) shifts to the employer to articulate a legitimate, non-discriminatory explanation for the challenged decision.  *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Once the employer articulates such an explanation, "the presumption [of discrimination] raised by the prima facie case is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).  The burden of production then shifts back to the plaintiff and merges with his ultimate burden to prove that he has been the victim of intentional race discrimination.  *See Burdine*, 450 U.S. at 253.  The evidence establishes that AGS believed Thomas mishandled a train carrying a hazardous inhalant and that Thomas then provided a written statement that conflicted with verified train data.  AGS provided Thomas an opportunity to be heard at an investigative hearing and again on appeal to the PLB, which unanimously affirmed his dismissal.  Thomas offers no evidence that this was a pretext for discrimination.  Thus, there is insufficient evidence from which a reasonable jury could conclude that race was the but-for cause (or played any role) in Thomas's termination.

Thomas has not presented "a convincing mosaic of circumstantial evidence" that would allow a jury to infer intentional discrimination by the employer. *Lockheed-Martin Corp.*, 644 F.3d at 1328.

## B. Retaliation

To establish a *prima facie* case of retaliation, Thomas must show (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relationship between the two events. *See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). To prove causation, a plaintiff must demonstrate that the protected activity and the adverse action were not "entirely unrelated." *Id.* at 1278 (noting other cases using the terms "wholly unrelated" and "completely unrelated"). "[T]o show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

If the plaintiff relies on proximity to establish the causal element of a prima facie retaliation case, the employer's knowledge of the employee's protected activity and the adverse action must be "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (stating that an adverse action taken twenty months after a protected activity "suggests, by itself, no causality at all"). Applying the "very close" standard from *Clark County School District*, the Eleventh Circuit has concluded that a "three month period between the [protected activity] and the [adverse action] does not allow a reasonable inference of a causal relation[.]" *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004). *See also Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008) (concluding that a six-month separation was insufficient); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (concluding a three-month separation was

insufficient). This is consistent with other circuits that have faced the issue. *See, e.g., Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (four-month period insufficient).

There is simply no evidence to support a causal link between Thomas's 2012 Charge and his dismissal in 2015.  While Thomas attempts to string together a timeline of events, he ignores the critical fact that Noe (who decided to charge him) and Roberts (who recommended dismissal after the investigative hearing) were unaware that Thomas had filed an EEOC Charge.  (Doc. 40-28 at 16 (58:4-10, 59:6-10); doc. 40-38 at 36 (133:13-19); *see also* doc. 40-1 at 48 (187:20-188:25)).  Regardless of temporal proximity, there can be no causal connection between protected activity and an adverse action when the decisionmaker is unaware of the protected activity.   *See Brungart v. Bell South. Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Regardless, because there is such a significant gap in time between Thomas's protected activity and the alleged retaliatory act, Thomas argues that courts have held that small slights over a period of time can be used to infer retaliation.  (Doc. 42 at 25-30).  In support, Thomas cites the *dissent*, not the controlling opinion, in *Taylor v. Solis*, 571 F.3d 1313 (D.C. Cir. 2009).  Notably, the court in *Taylor* affirmed summary judgment in favor of the employer as to the plaintiff's retaliation claim, finding the assortment of alleged retaliatory acts could not amount to a pattern of antagonism.

Thomas's alleged history of retaliation after his 2012 EEOC Charge begins with his June 2013 dismissal for passing a stop signal.  Thomas testified at his deposition that he did not believe his 2013 dismissal was retaliatory.  (Doc. 40-1 at 54 (210:20-23)).  Additionally, this dismissal was nine months after the protected activity, which does not meet the Eleventh Circuit's "very

36

close" standard.

Thomas next points to the eight banner checks he received within two weeks of his return in June 2014.  These banner checks occurred twenty-one months after the protected activity.  Even taking into account the year-long gap that Thomas was not employed with AGS, these banner checks do not appear to meet the "very close" standard.  Additionally, Thomas testified that he did not receive any discipline from the banner checks conducted in the weeks following his reinstatement.  (Doc. 40-1 at 17 (62:16-63:7); doc. 40-10).

Finally, Thomas claims AGS ambushed him with three additional charges on June 17, 2015, before his investigative hearing and nearly three years after his protected activity.  Thomas points to the fact that he received his Right to Sue Letter on June 10, 2015, and then, one week later, was subject to an investigative hearing on June 17, 2015.  This does not create temporal proximity required to establish a casual relationship that Thomas thinks it does.  The protected act is the filing of an EEOC complaint, which occurred in September 2012.  The receipt of the Right to Sue Letter is not protected activity that somehow would restart the clock or allow the timeframe to be remeasured absent other evidence that is not present here.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Curtis v. Broward Cty.*, 292 F. Appx. 882, 885 (11th Cir. 2008).   For these reasons, the timeline Thomas attempts to create based on events in June 2015 and July 2015 is insufficient to show causation.

At most, Thomas points to separate allegedly retaliatory acts taken by different people.  These do not establish temporal proximity to support a causal connection between Thomas's

termination and his EEOC Charge filed almost three years earlier.[30]   Absent evidence of a causal connection, including no evidence the decisionmakers were aware of the protected activity, Thomas cannot establish his retaliation claim.

Even if Thomas could present evidence to support a *prima facie* case of retaliation, there is also simply no evidence to support Thomas's pretext theory, i.e., that AGS was "lying in wait" to get rid of him (or any other evidence of pretext).   To the contrary, while Thomas might argue that AGS was waiting for a legal, legitimate reason to "fortuitously materialize" and then use it to cover up a retaliatory motive for firing him, given Thomas's performance and safety violations, no reasonable jury could conclude so.  *See e.g., Underwood v. Yates*, No. 16-cv-03276, 2018 WL 4494839, *11 (M.D. Tenn. Sept. 19, 2018).

## IV. Conclusion

For the reasons stated above, there is insufficient evidence to show a genuine issue of material fact as to either of Thomas's claims for discrimination or retaliation pursuant to 42 U.S.C. § 1981.  Accordingly, Defendant AGS's motion for summary judgment (doc. 36) is **GRANTED**, and this action will be dismissed with prejudice.  A separate order will be entered.

DONE this 28th day of March, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[30] Thomas's attempt to use Austin as a comparator for his retaliation claim (doc. 42 at 3) fails for the same reasons as it did for his discrimination claim.